Good morning, Your Honors. My name is Benjamin Kim. May it please the Court, I'm the attorney for Appellant Student Joseph Park, along with my co-counsel Paula Perman of the Western Law Center for Disability Rights, a public interest law firm which recognized the importance of this case for many children in the state of California who experience similar treatments from school districts. With respect to the time allotted for my argument, I would like to reserve five minutes for rebuttal. Your Honors, this appeal seeks a review and application of the congressional mandate under the Individuals with Disabilities Education Act, namely the nature and scope of the special education and related services appellee school district is required to provide to a child with a disability, and the extent to which procedural violations relative to assessments and development of a child's individualized education program results in the denial of a free and appropriate public education guaranteed under the Act. This appeal does not challenge the lower court's finding that the school district had denied Joseph a free and appropriate public education by failing to implement the IEP and by offering a placement in violation of the least restrictive environment mandate under the Act, and also does not challenge the lower court's finding that the district developed an IEP that includes self-help goals as well as by conducting additional assessments in the area of behavior as well as developing a behavior intervention plan. Counsel, can I take you to two points that are bothering me a little bit? Yes, Your Honor. What's the obligation with respect to language translation in a general way in these proceedings? Well, in a specific way in this proceeding, let's put it that way. Yes, Your Honor. There are two approaches with respect to the language involvement. One is when a parent whose primary language is something other than English, the school district is required to provide aid. I assume here we're dealing with a foreign language and the foreign persons who are not particularly literate in English, right? In this particular case, we're talking about a student whose primary language is Korean, and under the Act. We're talking about the parents who really are the guardian ad litem in the party to the litigation. Did the parents understand what was going on? The parent understood the IEP, the Individualized Education Team Meeting process, because the school district did provide a translator, although we challenged this. There's no problem here? With respect to the provision of the translator at the IEP meeting, there is no problem, and that's not an issue. And none is claimed. Very good. That's correct. That solves that. But with respect to the practice. Yes, but the Korean language issue does relate to the testing which produced the assessment. And the verbal testing in particular, as my understanding is, there was a translator in the room, but the translator did not administer the test. Correct, Your Honor. To the child. To the child. To the child, yes. The child was tested, was verbally tested in English when Korean was his primary language. I believe the school district's position is that they did provide a translator for the purpose of the assessment. But what our issue is that the Act requires that the child be assessed in his primary language, that is, in Korean. What the school district provided in response to that, in responding to the legal mandate as well as by their contractual agreement, is that, yes, we will assess this child in his primary language of Korean. And in complying with that, they brought a Korean-speaking bilingual school psychologist. And instead of having that bilingual psychologist assess the child in the primary language, that assessor did not assess the child, did not even speak a word to the child, and the assessment attempt and the eventual failure was obtained by the school psychologist who did not speak Korean, who did not understand Korean. And in what ways could that have affected the results of the test? The language barrier obviously was something that the Congress recognized as being an additional barrier a child with a disability will face when it comes to the assessment. So in order to obtain an accurate result of the child's ability, the Congress required that the school districts assess the child in his or her primary language. It is not through a translator, but through a by assessment must be done by. It's not like a translation of the test. It's the person who gives the test is required to speak. Yes, professional. And there's a qualification to that. In our case, it was more than feasible that the bilingual psychologist was able to assess the child. They had the bilingual psychologist present in the same room that the school psychologist who did not understand Korean was attempting to assess the child. And what is mind-boggling is why didn't they allow that bilingual psychologist? This doesn't make sense to me. I'll ask the other council about it. But those are the facts, and that is the... What was their theory, though? Their theory was that what they were doing was not verbal. Wasn't that the theory of the... The school psychologist gave up on her attempt to assess the child because, in her view, the child's disability manifested behavior was impeding her ability to assess the child. So she basically observed the child and made a conclusion as to the child's cognitive ability and other adaptive behavior disorders. There's some information that the child took clues better from action than from words, by pointing to things and describing things. The child has a limited verbal ability as a result. The child communicated... In words, something like that. No, that was the goal that the bilingual speech pathologist recommended that be placed in the student's individualized education program. That was the following year. That's correct, Your Honor. The child learned 10 new words in one year, right? That was the initial goal that was recommended by the bilingual speech pathologist. Was it 10 words in English or 10 words in Korean? In English. So did they know how many words he could speak in Korean? Yes. The bilingual...  They did not assess him in Korean in any of the areas that they have assessed him. We, the student, hired a bilingual speech pathologist to assess the child, and the bilingual speech pathologist noted numerous Korean words as well as English words that the child spoke. But some of those words, because of the articulation disorder, could not be understood by someone unless someone was familiar with the manner in which the child spoke or unless someone was familiar with the Korean language. Those factors were not accepted by the school district in the development of the IAP, and what they ended up basically doing was belittling the 10 words learning goal that the bilingual speech and language pathologist recommended, and that was apparently used by the hearing officer to justify that learning 10 new words a year is insignificant of a progress to be expected of a child, and therefore speech therapy was not necessary, which we believe is a violation of the Act. Counsel, the other one that's bothering me a little bit. Would you give me the precise standard by which you would claim an attorney's fee as a prevailing part? Yes, Your Honor. This Court has stated on many cases that a party prevails in a proceeding such as this if that student, if that party obtains a victory on any one of the significant issues that was brought forth. All right. How do you define significant? I would give example of the couple of cases that this Court has decided on what issues were significant to the Court. In this case? In this case, yes, Your Honor. You've raised a number of issues, including the last one we just discussed. Correct. I understand that, and you may prevail on one or more of them, but what I'm looking for is a general. Let's take the last standard we just talked about, the language application. If you make some headway on that and you get some partial relief on that, would you be entitled to an attorney's fee? To the extent that that is, that touches upon the significant aspect of child's educational program that we challenged. Can you tell me whether it's significant at all? I believe that it's significant, Your Honor. A child like Joseph, whose primary need is an opportunity to develop speech skills, is an opportunity to develop oral and motor skills so that he can articulate sounds correctly. Let's assume that standard applies and you get some relief on this. Now, all the other relief that you've sought and troubled, as you indicated in the brief, let's assume for the minute you don't get any relief on that. Now, how do I fix the fee? All your time on both the losing and the prevailing issues is included in the base number of hours that I apply the rate and then look at a further award because of a degree of difficulty or some other factor that is not measured by time. I believe the case laws give guidance to the court, and the case laws indicate that when there are a number of issues that a party has litigated and the party prevails on one or fewer of the issues on that case, the totality of the fees should not be divided according to the number of issues or based on the significance of each of the issues to the extent that the issues as a whole are one and the same of the overall relief that is being sought by the litigant. I think the only distinction that the cases make with respect to the division of attorneys' fees is when the claim that was not prevailed upon is 80% of your brief may have gone to the printer dealing with issues in which you don't prevail, and maybe 20% are issues that you do prevail. Do you get your total cost of the brief? If the 20% is a significant issue that which we prevail on, yes, I submit You're winning and losing issues. Are you sure? I don't understand that to be the law. I thought that the district court has the discretion to apportion. Maybe it's the IDEA law, but in general that the district court has the discretion to apportion fees and costs as between prevailing issues, and that's my general understanding. Is there something specific in the IDEA that says something different? Not that I know of, Your Honor. My understanding is that general fee-shifting provision as set out in the Civil Rights Act of 64 would apply, and the case is interpreting the lead case in the Ninth Circuit that supports your position. Which case, Your Honor? The best case you have decided by the Ninth Circuit that spells out your theory of attorney's fees. That would be the Union v. Smith and supported by the United States Supreme Court case, Hensley case. And that Hensley case really sets the guidance as to Well, Hensley is a wonderful general discussion of fixing fees in general. It has no specific application here. It's a general application statute. I understand Hensley, because I think that's what most of the fees that we're asked to fix, counsel submit timesheets, they submit expert witness statements. We may even refer it to our court commissioner who has hearings and makes a report and recommendation concerning fees to us, and then the panel considers that and either approves or disapproves of the recommendation and fixes the fee, and then it goes out as part of the mandate or the remitted or back to the district court, and that's where it becomes a judgment, and then you go to your collection process and so on. But that's how typically fees are fixed. And what I was gathering from reading your brief, I was getting the impression that your position is no matter how narrow the issue, no matter how small the success, the lawyers are entitled, or the students are entitled to fees. That is not my argument, Your Honor. My argument goes to the significance of the issues that we have already prevailed that are not subject of the appeal. And our position is that the issues that we have prevailed on in the lower courts are significant enough to the point where we should be given the prevailing party status. Doesn't the district court fix those fees? I mean, we didn't we weren't parties to that. I mean, we don't necessarily have to review that record, do we? We're not the fee-fixing agency for what goes on in the district court. The district court can run its own business. That's correct. But this Court has to look at the appeal. Yes. And my understanding is that this Court has the authority to fix the prevailing party status or make a decision on that issue. And then if we decide that the district court erred in saying that you weren't a prevailing party, we then remand it and the district court does the fair and appropriate fee determination. I believe that's one way to address this issue. That wouldn't satisfy you if it was remanded? Yes, Your Honor. Okay. Thank you. Now, with respect to the related services, and that's really the heart of this case, it is our position that the act that is in question mandates school districts to provide special education and related services. Special education is, it includes related services. And, in fact, the cases and the statute that are before this Court emphasize the importance of related services to children with severe disabilities. For a child like Joseph who has severe delays in speech and language, finding worse motor skills, and poor muscle control, these are the types of issues that the Congress was struggling with and Congress has enunciated and accepted in enacting the act. And in enacting the act, Congress did not give discretion to the school district to say, well, this is the law, and if you feel the child is necessary to receive these services, you can make that decision. It did not say that. It mandated school districts to hire these qualified personnel, such as speech pathologists, occupational therapists, and physical therapists, knowing that children like Joseph would require direct services of these professionals. Now, what is really interesting is the district's response in denying that related service. Their response is simply that we recognize that Joseph has all these disputes, and, in fact, we're willing to stipulate on the record, which they did, that those are Joseph's unique areas of need. However, it's our opinion that he does not need the direct related services to benefit from special education. That argument is inconsistent, and it's a flawed argument, and it goes directly against the type of mandatory service that is required of the act. Now, was Joseph able to take advantage of the compensatory services awarded by the, I guess, the administrator, I guess the school district? To the school teacher? When they, I have a problem with the award of the compensatory services to the school as opposed to Joseph directly, because I'm questioning whether he would have been in a position to take advantage of those, given that the other recommendation was that he transfer schools. That's correct, Your Honor. As you know, we prevailed on the school's district to, their desire to transfer Joseph from that school to another school, which the parent objected to and which we prevailed on. And Joseph would have been obviously available to receive direct services, and he would benefit from any type of compensatory educational services that was awarded to him directly. But the flaw in that ruling is awarding, in essence, enriching the school district for the wrongs that it committed against Joseph. And there's no guarantee that a school district teacher who received that, who receives that compensatory education would somehow provide that service to Joseph. But more important than that, this is a case where Joseph needs direct services of the professional, not through someone who's unqualified, someone who does not know the field of occupational therapy or speech therapy, and somehow we expect that untrained person's training received from a trained Joseph. I mean, it's a trickle-down effect, but trickle-down effect is not something that the Congress envisioned, and it's not something that they have accepted as being an allowable type of practice. And that's why it's our position that the Congress required school districts to hire all these professionals. You wanted to reserve some time, and you're running out. Yes, Your Honor. I will reserve my time to stop right here. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Jonathan Mott representing the Respondents, Defendants, Anaheim Union High School District, and the SILPA. Our position is that both the Administrative Hearing Officer and the District Court appropriately found that the assessments by the school district were appropriately performed. The assessments were complete. The plaintiffs were able to assist in the development of the assessment plan. The IEP meeting was timely initiated, and the assessments were not culturally biased. The plaintiffs, on the other hand, offered very little in the way of countervailing assessments. Theirs were by less qualified people who spent less time with the child. Instead, they preferred to attack the competency and the integrity of the district's teachers and specialists who did the assessments, some of whom had actually worked with the plaintiff in the prior school district for several years. Also, both the Hearing Officer and the District Court found that, accordingly, the district had prepared an IEP with the participation of the plaintiffs that offered FAPE, Free Appropriate Public Education, to the student with appropriate goals and objectives that are set forth in great detail, detailed, measurable, and designed for this particular plaintiff individually. The goals and objectives were designed to offer some measure of self-sufficiency in everyday activities like cleaning up, following directions, communicating, interacting with others. Communication, in particular, was an issue. This child had a very limited verbal ability, almost nonverbal. If communication was such an issue, why weren't the assessments done by a Korean-speaking person? Because there was no normed assessment test in Korean. The test was in English. It was translated and given by someone who understood Korean, and you might be able to understand when Joseph was attempting to say a word in Korean that an English-speaking person wouldn't understand was close to an actual word or respond in that way. If you don't understand the language, you don't pick up a word that's pronounced incorrectly, right? Yes, Your Honor. That was discussed in great detail in the hearing and in the two decisions. It's a false— We understood that there was a Korean-speaking person in the room, but that person did not administer the test. Yes, it's a falsehood to assume that you can take an English test and translate words or questions into Korean and get responses back that are normed back into the English test. Why is that? You'd have to have a Korean test. Why is that? Because the words are not analogous in English and Korean at all times. Some words have multiple meanings in Korean, but they don't have an English if you try to translate a word over. And that was discussed in the testimony. It's a very obscure kind of thing. You have to understand the two languages and the difficulty of the Korean language, apparently. But the law requires you to do a very individual-specific assessment, right? You're talking about— The school district. There were a number of assessments, yes. But all of them have to be tailored to the individual child and the unique needs of the individual child. Yes. Well, this child was a Korean speaker. Well, not really. I don't want to admit that he was a Korean speaker. He had very limited verbal ability. He had 10 words in English and 10 words in Korean about that. That's not a Korean speaker. That's not a primary Korean speaker. That's not a verbal person in either language. That's a very minimal or limited verbal ability. What about his understanding? Maybe one thing that he only can speak 10 words. How many words could he understand? He could understand a little more, and his understanding was often through visual means or by body language rather than by speaking. And that was what the district felt that they should move in the direction of, giving him a picture device or flashcard device where he could communicate his needs using pictures, which he seemed to understand better than words. And there seemed to be no reasonable prospect that a 13-year-old with a 20-word vocabulary was going to get anywhere with speech if speech develops at the age of 3 or 4 or 5, and if it doesn't develop by 5 or 6, the testimony was that it's not going to develop. He's 16 now? Yes. And is he still at your school district? Yes, he's moved on to the high school. He's still in a mainstream program in a high school now, in 10th grade level, but in a special day class. And you're still performing these assessments every year? Whatever the schedule is, I'm not sure. I believe there's an IEP every three years, or on demand as needed if there's something unusual. But they're still current in all the assessments and IEPs. And eventually someone who has this very limited cognitive ability, which is essentially a severe mental retardation due to a genetic defect, eventually when they reach 18, they will go into other programs offered by social services agencies that will try to continue to train them to have some degree of self-sufficiency. But this is a person who will always require either living with a family or being institutionalized in some way. One question I have is, when the hearing officer decided to award the compensatory services directly to the school and not to Joseph, was it appropriate to consider the fact of the pending confidential settlement with the Magnolias School? Well, they went around about that in the hearing and the hearing officer put a detailed footnote in his decision about that. But both sides decided that they were going to respect that confidentiality and not get into what that was. So how could he appropriately consider it if he didn't know what it was? That there was something there and that, in any case, the OT services for a child this severely disabled were most appropriately provided by the special day teacher and the way to assist with compensatory education was to have essentially a specialist or a coach to help that special day teacher every week with some advice and training on how to approach the child. And that's how they structured the compensatory education. I wouldn't say that it was for the benefit of the district or for the benefit of the teacher. It was for the benefit of Joseph through the teacher. We touched on the communications issue, the goals and objectives that the plaintiff wanted simply were not realistic in light of the severity of the disability of this child. We believe the district prevailed entirely on the issue of the appropriateness of the assessments, the related issues with the reimbursement for plaintiff's assessments and independent assessments, and the district substantially prevailed on the issue of the free appropriate public education offered by the IEP. There were two brief periods of time that they found had not met the standard of free appropriate public education. The summer term when he was transitioning from the elementary to the high school district, there were some laughs there, and the first two months when the IEP and the assessments were being done, and they just weren't done yet. But there's no showing of any harm to the plaintiff thereby. Also, the district substantially prevailed with respect to the least restrictive environment. The district felt that its specialized special education school would have been better for this child given the severity, but the plaintiffs insisted that he remain at the Lexington school and be mainstreamed there, and he stayed there. And, again, that was found to be the least restrictive environment. So, again, it's hard to see any harm from that. As I noted, he went on to a high school, which is also a mainstreaming school. Can you explain to me how you mainstream a child like this? Well, it's difficult. They have a special day class in the junior high school or the high school, which is a separate classroom with a small class of about ten students with, in this case, a teacher and three aides. So there's almost a one-to-one or one-to-two relationship available. And, obviously, a child with these deficits can't participate in any 7th to 12th grade classes. They have their own classes in this little classroom. But they will go out and play to the extent they can with the other students, or they will go to the cafeteria and things like that. There's contact, at least, with peers of the same age rather than being in an entirely special education school. We feel that both the hearing officer's decision and district court's decision were thorough and careful using the terminology of the Capistrano v. Wartenberg case, both of them very deep, lengthy, and detailed. And we would urge that the decisions be affirmed. Judge Beeser, I think, raised an issue about fees. And this is a problem that we see with many cases in the district courts of plaintiffs claiming that they're entitled to the entire fee every dollar that they spend on the case if they have possibly prevailed in just any extent on any issue. And we feel that that's wrong and that's becoming abusive. I would urge the court to lay out some standards with regards to fees and what the standard is for someone to- Can you give us any help from the Supreme Court? Any other cases you might be aware of? The Klesselman case, I think, was mentioned. And that talks about having substantially prevailed or significantly prevailed in order to receive fees. We don't feel that they significantly or substantially prevailed in anything in this case. But suppose we were to find that they did prevail on maybe not the most critical issue, but certainly on a few issues in this case. In fact, in a way you could say they prevailed just by moving the district. And that's a hard fight. It is a hard fight for parents of children who are disabled. What would be inappropriate about apportioning the fees to the part in which they did prevail? Is there a law against that? No, there's no law against that. And I think some standards need to be laid down. The Supreme Court recently dealt with one of these cases. And in the context of the merits, as opposed to attorney's fees, put the burden on the parents to show the error in the lower federal courts. Would that same kind of a burden or standard apply in the fixing of the fee? Well, I think they have to show that they've prevailed on a significant issue and that they're entitled to a fee for that. The statute provides for fees. You get this squishy standard of substantial or something like that, and I have a lot of trouble with it because there's no yardstick that goes with it. You may think it's substantial. I think it's insubstantial. That's what we get from the lawyers. But we're here sitting in the middle of this. And I think you have to look at whether anything they achieved was significant to the outcome or changed the student's educational process in any way or whether it was simply a technical victory which clarified some document required. They can take on a procedural question under this Act. They get a substantial victory, and it changes the course and speed of every case that's going to be decided in the United States for the next 20 years. And I should think if they did that, they would be entitled to a fee. It's a substantial change of procedure. Yes, that's true, Your Honor. So it's not limited just to the merits decision, is it? That's true. If there's a legal issue that's changed as a result of the case, then a fee might be appropriate. We don't feel there's any real legal issues here. These are factual issues regarding this particular child's IEP and training. Thank you, Your Honor. Thank you. If you have any questions, I'll be happy to. Any more questions? No. All right. Thank you, Mr. Kim. Thank you, Your Honor. I believe it bears emphasizing the fact that there is no concrete evidence of Joseph's cognitive ability or that he has a severe mental retardation.  School psychologists stated that she gave up on even her attempt to assess the child and her opinion is simply based on her observation of Joseph's behavior. And those behaviors, as she noted, that she lacked knowledge in how Joseph's disability manifested in certain behaviors. But as the school district eventually stipulated too, the behaviors that he exhibits are manifested by his disability. And the school psychologist's opinion on his cognitive ability or mental retardation are purely speculative, as she admitted during the hearing, that she could not say whether or not Joseph has an IQ of 69 or even 1. So her opinion was in wide range of between IQ of 1 or 69. She didn't even know. And the Supreme Court say her burden was now with respect to those facts. I believe with respect to those facts, Your Honor, the Supreme Court would say school district has failed to conduct the assessments as enunciated in the Act. The Act specifically ---- So they have the burden of proving that the assessment they did met the legal standard. You don't have a burden of proving anything. No, Your Honor. We do have the burden. And we proceeded as though we had the burden of proving that their assessments were inadequate. And in proving that, we pointed out that the school district not only did not follow the assessment requirements that are clearly set forth in the Act as well as in the California Code, but their opinion on Joseph's ability was founded on assumed assumptions, assumptions based upon observation of Joseph's disability, which I believe is something that this Act stated should not be assessed. Now, another aspect of the assessment that we challenged was the requirement of providing a medical service for diagnostic or evaluation purposes. School district admitted that they have a policy of not providing medical service for any purposes, even for diagnostic or evaluation purposes, yet the law is clear that if medical service is required for the purpose of diagnosing a child, that is a part of the related service mandated by the Act. In our case, the audiologist, school audiologist did not complete the assessment because of the need for medical service. So the assessment, audiological assessment was left incomplete. And with respect to the vision assessment, with the suspected double vision, nerve damage, with the limited vision or loss of vision in one eye, which records were clearly noted in the past school records, the school district refused to look at that issue. Was the student under any medical care through his parents at all? The student has a general, has a pediatrician, yes, Your Honor. Were they called as witnesses in this matter by the parents? The parents submitted a declaration from the students. Did the medical personnel testify? Did not testify, only through the written declaration, Your Honor. And the doctor recommended. But what was testified to was the parents' understanding of what the medical people decided or understood? No, Your Honor. What the parent testified to was the set of information that was already in the school records. The information is directly from the school personnel who have seen Joseph, the school nurses, for example, who recommended. Did any medical doctor file or the report of any medical doctor appear in this transcript at any place? Other than the declaration of the medical doctor for Joseph, no, Your Honor. But I submit that the obligation to employ the medical service for, yes. I just want to know if there was any medical record. I didn't observe any. That's correct, Your Honor. There is no medical record. And so in this case ---- Counsel, you've exceeded your time. Do you just want to sum up? Thank you, Your Honor. This case presents very important legal questions that will have statewide implications with respect to the scope of educational agencies' responsibilities under the Act. And those questions include what is the scope of compliance required under the Act with respect to assessments? Is there a room for substantial compliance when the facts surrounding the district's assessment clearly violate the Act's mandate? Second question, what is the legal standard by which a school district can unilaterally reject the need for related services such as speech therapy, occupational therapy and physical therapy, even as the school district stipulates on the record that the child has unique needs in these areas and that we believe the school district's argument that child's disability or the severity of the disability should be the basis for quick cleaning of services is totally against the Act's mandate, and those issues have been rejected by the courts in Timothy W. as well as Till that we cited in the brief. Thank you. All right. Park v. Anaheim Union School District is submitted.
judges: Beezer, Hall, Wardlaw